## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**TACHUNDA R. MARTIN**
**o/b/o M.A.M.,**

      **Plaintiff,**

**v.**                                       **Case No. 5:12cv100/RS/CJK**

**CAROLYN W. COLVIN**[1]
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. Plaintiff, a minor child, will be referred to as claimant or as plaintiff.

---

[1] Carolyn W. Colvin succeeded Michael J. Astrue as Commissioner of Social Security, and is automatically substituted as the defendant. FED. R. CIV. P. 25(d).

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, should be affirmed and the application for benefits denied.

## PROCEDURAL HISTORY

Claimant has filed a Title XVI application for supplemental security income. T. 26.[2] His original applications for supplemental security income were denied initially on August 8, 2008, and upon reconsideration on November 18, 2008. T. 26. Claimant then requested, and appeared at, a hearing before an Administrative Law Judge (ALJ) on August 17, 2010. T. 26. Following this hearing, the ALJ issued an order unfavorable to the claimant. T. 23. The Appeals Council of the Social Security Administration subsequently denied review. T. 1. The ALJ's order then became the final decision of the defendant Commissioner.

## FINDINGS OF THE ALJ

In the written decision, the ALJ made a number of findings relative to the issues raised in this appeal (as numbered in the ALJ's order):

3. The claimant has the following severe impairments: oppositional defiant disorder, attention deficit hyperactivity disorder, and a history of impaired language skills.

---

[2] The administrative record, as filed by the Commissioner, consists of 9 volumes (docs. 7-1 through 7-9), and has 377 consecutively numbered pages. References to the record will be by "T.", for transcript, followed by the page number.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      The claimant does not have an impairment or combination of impairments that functionally equal the listings (20 C.F.R. 416.924(d) and 416.926a); therefore, the claimant does not have an impairment or combination of impairments that result in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning:

> a) claimant has less than marked limitation in acquiring and using information;
>
> b) claimant has less than marked limitation in attending and completing tasks;
>
> c) claimant has less than marked limitation in interacting and relating with others;
>
> d) claimant has no limitation in moving about and manipulating objects;
>
> e) claimant has less than marked limitation in the ability to care for himself;
>
> f) claimant has less than marked limitation in health and physical well-being.

6.     The claimant has not been disabled, as defined in the Social Security Act, since April 28, 2008, the date the application was filed.

T. 29-36.

In his memorandum of law, claimant raises three issues: 1) the ALJ erroneously adopted Dr. Oksanen's opinion, 2) the ALJ erroneously found that plaintiff's impairments did not meet Listing 112.11, and 3) the ALJ failed to properly assess whether plaintiff's mental impairments functionally equaled a listing impairment. (Doc. 13, pp. 11, 15).

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the

evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[3]

"An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(c)(3)(I). The ALJ must first determine whether a child "[is] doing substantial gainful activity," 20 C.F.R. § 416.924(a); if not, the ALJ must then assess whether the child "has 'an impairment or combination of impairments that is severe.'" *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004) (*citing* § 416.924(a)). If the ALJ concludes the child has a severe impairment, the ALJ is next tasked with determining whether the child's

---

[3] The Eleventh Circuit not only speaks of independent review of the administrative record, but it also reminds us that it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 11th Cir. 2002).

impairment is "disabling," meaning such an impairment causes the child "marked and severe functional limitations." § 416.924(d). A child's severe impairment causes "marked and severe functional limitations if it meets[,] . . . medically equals[,] . . . or functionally equals the listings." *Id*. To functionally equal the listings, a child must have a "marked" limitation in at least two, or an "extreme" limitation in at least one, of the following six "domains" of life: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and, (vi) health and physical well-being.[4] § 416.926a(b)-(d); *Muhammad ex rel. T.I.M. v. Comm'r of Soc. Sec.*, 395 F. App'x 593, 599-600 (11th Cir. 2010). The regulations define a "marked" limitation as one that is "'more than moderate' but 'less than extreme.'" § 416.926a(e)(2)(i). A "marked" limitation is equivalent to standardized test scores "at least two, but less than three, standard deviations below the mean." *Id*. A finding that a limitation is "extreme" does not signify "a total lack or loss of an ability to function;" instead, such a finding indicates a limitation is "'more than marked,'" with standardizes test scores "at least three standard deviations below the mean." § 416.926a(e)(3)(i).

---

[4] The regulations provide further clarification of the proper age appropriate functioning in each of the six "domains" of life. *See* § 416.926a(g)-(l).

## FACT BACKGROUND AND MEDICAL HISTORY[5]

At the hearing, plaintiff's mother, Tachunda Martin, indicated that plaintiff is fifteen years old.[6] T. 48. Plaintiff is right-handed, five feet and one and three-fourths inches tall, and weighs eighty-six pounds. T. 49. He lives with three other children–two males aged sixteen and ten, and one female who is nine, and attends St. Andrews Elementary school, where he is in exceptional student education classes.[7] T. 48. Plaintiff was expelled from other "regular" schools. T. 48. He often completes his homework at school with the assistance of school staff. T. 54. When he brings his school work home, "[h]e rushes through it;" his mother reviews it, however, and makes him correct any errors. T. 54. According to his mother, plaintiff is "doing pretty good but he still has problems with touching and putting his hands on other students and not paying attention and everything;" he "puts his hands on other kids" including his siblings, he likes to fight and "just has to hit someone[,]" and wants to kill people, including himself. T. 48-49. He was diagnosed with attention deficit hyperactivity disorder ("ADHD"). T. 49. Plaintiff can do simple arithmetic, including addition and subtraction, but in his mother's opinion has a language impairment which limits his reading ability. T. 49. Plaintiff reads at a third grade level despite being in the sixth grade. T. 49. Plaintiff also needs reading

---

[5] Although intended to be thorough and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

[6] The court's recitation of the facts and medical history is based on its independent review of the record. *See Tieniber*, 720 F.2d 1251 (11th Cir. 1983).

[7] Various individuals throughout the record claim that plaintiff was held back in the first and third grades. T. 267.

glasses, but has acceptable hearing.  T. 55.  Plaintiff's behavior problem is similar to oppositional defiant disorder in that "[plaintiff's] just going to do it his way."  T. 49. He also complains of pain in his legs.  T. 50.  Plaintiff looks like he walks with a limp and complains that his bones are hurting when the house is "very cold."  T. 50.

Plaintiff is on Concerta, Ritalin, and Seroquel.  T. 50.  He has trouble getting up sometimes because of Seroquel–a sleep aid.  T. 51.  Plaintiff can run, walk, jump, ride a bicycle, and run up and down stairs.  T. 51.  He cannot go to the store by himself.  T. 51.  If plaintiff wants something, he will ask for it and throw "a fit" if he does not get it.  T. 52.  Plaintiff can get dressed by himself, but he needs someone to lay out his clothing for him.  T. 52.  He can tie his shoelaces, brush his teeth, bathe himself, "get" his own breakfast, catch the bus to and from school, and will complete household chores, such as taking out the trash and raking the yard, after being told "[a] couple of times" to do them.[8]  T. 52-53.  Plaintiff also plays football and goes to church "sometimes."  T. 53.  He apparently has no friends and plays with his siblings and cousins.  T. 53.  In the afternoons, he plays video games and watches television for thirty minutes after football practice.  T. 53.  He goes to bed at 9:00 p.m.  T. 53. Plaintiff also testified at the hearing.  T. 50.  The ALJ inquired about the pain in plaintiff's legs, but his responses were inaudible.  T. 50.

According to his progress reports for the 2007-08 academic year, claimant made "some progress" in the areas of communication and behavior.  T. 141-42.  With regard to writing, however, claimant made "no progress" on the first report and only "some progress" on the second report.  T. 143.  Claimant's writing was "very simple"

---

[8] Plaintiff's mother stated that plaintiff will ignore her requests for him to do his chores until she "literally get[s] up and be in face [sic]."  T. 53.

and was lacking in "details and interesting vocabulary." T. 143. Although claimant initially made no progress in reading, he later made "some progress." T. 144. He was "struggling with his reading comprehension" and was advised that he could improve his reading ability by reading at home and then being asked questions about what he had read. T. 144.

According to a May 8, 2008, questionnaire completed by Sandra[9] May, plaintiff's third grade teacher, plaintiff's reading, mathematical, and writing abilities were all at a second grade level. T. 171. Under the category of "acquiring and using information," Ms. May noted that plaintiff had a "serious problem" in understanding school and content vocabulary, reading and comprehending written material, providing organized oral explanations and adequate descriptions, expressing ideas in written form, and applying problem-solving skills in class discussions.[10] T. 172. Ms. May also noted that the claimant had an "obvious problem" in every other function listed under this category, but commented that he "use[d] his time wisely," moving on to subsequent tasks once he finished his assignment. T. 172. Ms. May mentioned that claimant seemed to enjoy school and reading books on his reading level and would ask for help when he did not understand something, which often occurred with new material. T. 172. She further noted that plaintiff had a serious problem completing work accurately, without making careless mistakes, and following multi-step instructions. T. 173. In the remaining sections under the category "attending

---

[9] There appears to be some confusion concerning the name of plaintiff's third grade teacher-- specifically, whether it is Sandra or Samara. Throughout this Report and Recommendation, she will be referred to as "Sandra" or "Ms. May."

[10] The rating system ranges from "no problem" to "a slight problem" to "an obvious problem" to "a serious problem," and finally, "a very serious problem."

and completing tasks," Ms. May indicated that plaintiff had "no problem" or only a "slight problem." T. 173. With regard to medication, Ms. May noted that, after taking medication, claimant "is calmer, focuses in on tasks and completes assignments, able to control impulse to talk out, able to handle frustrating situations." T. 177. Under the category titled "interacting and relating with others," she indicated that the plaintiff had a serious problem in the area of using adequate vocabulary and grammar to express "thoughts/ideas" in general, everyday conversation.[11] T. 174. The remaining areas under this category consisted of obvious or slight problems. T. 174. Under the fourth category–"moving about and manipulating objects"–Ms. May noted no problems at all. T. 175. In the fifth category, "caring for himself or herself," Ms. May noted no serious problems, but four obvious problem areas. T. 176.

*Plaintiff's Medical Records*

Claimant was first seen at the Life Management Center on September 13, 2004, at which time he was diagnosed with oppositional defiant disorder. T. 244. He was observed to have "marked or repeated" behavior in hyperactivity. T. 240. Several years later, on April 5, 2007, it again was observed that claimant had "marked or repeated" behavior in the areas of inattentiveness and impulsiveness, and that he was "fidgety." T. 233-34. On January 15, 2008, plaintiff saw Dr. Yahia Rahim who prescribed him Adderall. T. 246. Dr. Rahim discontinued the prescription three months later, however, and prescribed Vyvanse instead. T. 246. Then, on June 19,

---

[11] Ms. May also noted that, as a familiar listener, she was able to understand "almost all" of plaintiff's speech. T. 175.

2008, Dr. Rahim discontinued Vyvanse and prescribed Concerta; he reissued the prescription on September 9, 2008. T. 246-47, 277.

On June 31, 2008, claimant was evaluated by Speech Language Pathologist Peggy Kundo. T. 267-68. During that visit, Ms. Kundo noted that plaintiff's mother indicated he was enrolled in speech-therapy classes and was making "a lot of progress." T. 267. Ms. Kundo noted that his Goldman Fristoe Test of Articulation-2 had a "standard score of 94" and "[o]verall speech intelligibility at conversational levels with familiar listeners with known context was 100% and with unknown context was 75%." According to Ms. Kundo, claimant's overall speech intelligibility at conversational level with unfamiliar listeners with known context was 100% and 85% with unknown context." T. 267. Ms. Kundo concluded that claimant's language skills were "inconsistent with those of typically developing peers" and that claimant's "[s]pontaneous speech was remarkable for paucity of content and quality." T. 268. She nevertheless found that claimant's language skills were "adequate" for following simple directions, expressing basic needs, and participating in conversation. T. 268. She noted that claimant sat "appropriately" in his chair, was "attentive and polite" during the examination, was direct, took turns in conversation, tried "to repair miscommunication[ ] with fair success," and attempted to "generate coherent stories using . . . pronouns and conjunctions . . . to tie one sentence to another;" she also noted, however, that claimant was not able to use "presuppositional knowledge." T. 268. Overall, Ms. Kundo found claimant's language skills "severely impaired," his speech skills "mildly impaired," and that his communication ability would "likely . . . negatively affect his overall learning and social development." T. 268.

Approximately five weeks after claimant saw Ms. Kundo, he was evaluated by pediatrician Barbara Adams and psychologist Suzanne Zoss, non-examining State Agency consultants tasked with determining whether plaintiff was disabled.  T. 270. Dr. Adams and Ms. Zoss noted plaintiff's established impairments of moderate receptive language disorder, severe expressive language disorder, and ADHD and determined that plaintiff had a marked limitation in the area of acquiring and using information, less than marked limitation in the area of attending and completing tasks, less than marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, less than marked limitation with respect to caring for himself, and no limitation with regard to health and physical well-being. They thus concluded that plaintiff was not disabled.  T. 271-72.  In their findings, Drs. Adams and Zoss explained that they only partially credited plaintiff's parents' statements because they were disproportionate to the evidence of record.  T. 274. Claimant underwent another evaluation by State Agency consultants Dr. Minerva Hernandez and Psychologist Linda O'Neil on November 3, 2008, who essentially affirmed Drs. Zoss and Adams' findings.  Specifically, Dr. Hernandez and Ms. O'Neil concluded that plaintiff demonstrated marked limitation in the area of acquiring and using information; less than marked limitation in the areas of attending and completing tasks, interacting and relating with others, and caring for himself; and no limitation in the areas of moving about and manipulating objects and health and physical well-being.  T. 282-83.

On February 4, 2009, claimant was administered various cognitive assessment tests by psychologist Fred Schnepel for use in a school psychological report.  T. 306. Claimant's scores on the Differential Ability Scales examination were in the "below

average range," which indicated that claimant's nonverbal abilities were "significantly lower than that of most children his age." T. 307. According to Dr. Schnepel, claimant could be "expected to struggle with most grade level academic skills if substantial academic supports [were] not provided and maintained." T. 307. Dr. Schnepel found that claimant demonstrated "good reading fluency" but below average letter-word identification and passage comprehension scores. T. 307. On the math examinations, claimant showed average fluency; however, he had below average scores on the applied problems sub-test. T. 307. Although claimant was in the fourth grade at the time of the evaluation, he had an overall reading grade level of 2.8 and an overall math grade level of 3.8, which indicated that he was "functioning below average cognitively and academically." T. 308. Dr. Schnepel noted, however, that claimant's "present educational setting [was] meeting his basic needs" and that claimant's teachers had reported "significant progress" and "improvements" by the claimant, which they attributed to his medication. T. 308.

Bay District Schools developed an "individual education plan" for plaintiff while he was in the fourth grade. T. 287-305. As of March 18, 2009, plaintiff was able to "listen and follow directions, complete tasks in group therapy with moderate assistance, and ha[d] made progress on synonyms, antonyms, and some grammar concepts." He "still need[ed] to improve his understanding and usage of irregular plural nouns, irregular past tense verbs and higher level synonyms/antonyms (related to vocabulary)." T. 293. Plaintiff had difficulty answering "why" questions with "organized, complete responses." T. 293. He was able to identify "sight" words at a third grade level, read 103 words per minute, and read at a second grade level, but he struggled with spelling and word meaning, and his poor reading comprehension

made it difficult for him to understand new material.  T. 293.  Plaintiff also had trouble producing appropriate grade level writing samples due to his difficulty with sequencing and detail, as well as proper verb usage and tense.  T. 293. He apparently enjoyed math and helping others when they were having problems, but he had difficulty with multiplication and division.  T. 293.  He also had trouble following directions when the directions pertained to something he did not want to do, but he was able to be polite and use manners and appropriate social skills "when he desire[d]."  T. 294.  Finally, school officials noted that the plaintiff was disruptive, made noises, picked on other children, and refused to listen to what he was told.  T. 294.

Licensed Clinical Social Worker Cathy Supon Connor evaluated claimant on September 10, 2008, and found "marked or repeated" characteristics in the areas of alertness (but noted that he was not drowsy, bored, lethargic, or inattentive), "happ[iness]," and "average" intellectual functioning.[12]  T. 344-45.  She also found "marked or repeated" difficulties in claimant's sleeping and eating, but observed that claimant was "effective at school on the medication," continued "to get into trouble for being disruptive in class, call[ed] out, [could not] focus, and [was] fidgety . . . ."  T. 348.  Ms. Connor recommended "I&F therapy to address issues of parenting and behavior management" and referred plaintiff to a psychiatrist for medication evaluation.  T. 348.

From October 15, 2003, through August 5, 2010, plaintiff received psychiatric treatment from advanced registered nurse practitioner ("ARNP") Stephen J. Chesser.

---

[12] Notably, Ms. Connor did not check "deficient" intellectual functioning despite the fact that there was an opportunity for her to do so.

T. 314-53.  On October 15, 2008, plaintiff's parents took him to Life Management Center seeking help with his ADHD and anger problems.  T. 330.  Chesser diagnosed plaintiff with "ADHD, Hyperactive Type, R/o Oppositional Defiant Disorder," and assigned him a global assessment of functioning ("GAF") score of 50.  T. 331.  According to Chesser's notes, plaintiff's appearance was within normal developmental limits and his motor behavior was hyperactive but also within normal limits.  T. 332.  His mood and affect were "blunted/flat," but his quality and content of "speech/thought," as well as his perception and "sensorium," were within normal limits.  T. 332.  Chesser prescribed plaintiff Seroquel, Concerta, and Ritalin.  T. 331.  On November 13, 2008, Chesser again evaluated the plaintiff and noted that, according to his parents, plaintiff was "doing very well with [medications]."  T. 328.  Chesser indicated that the plaintiff was sleeping and functioning at school "much better," not having "nearly as many melt downs" in the afternoons after school, and was "doing really well" overall.  T. 328.  Chesser further indicated that plaintiff's appearance, motor behavior, mood and affect, anxiety, quality and content of speech and thought, perception, cognitive functions, and "sensorium" were all within normal limits.  T. 329.  On February 6, 2009, Chesser again noted that plaintiff's medications "seem[ed] to be doing very well for him."  T. 326.  He diagnosed plaintiff with ADHD and disruptive behavior disorder, and assigned him a GAF of 60.  T. 326.  He also prescribed plaintiff Periactin to encourage him to eat more and again indicated that all of plaintiff's qualities were "within normal limits" and that his general attitude and behavior were "friendly/cooperative."  T. 326-27.  Several months later, on May 1, 2009, Chesser again observed that plaintiff's medication was "doing well for him" and that plaintiff was "sleeping well, eating well, and continu[ing] to grow."  T. 324.

He reiterated that plaintiff's GAF was 60 and that his individual characteristics were "within normal limits." T. 324-25. He commented that plaintiff's motor behavior was "hyperactive/agitated," but also still "within normal limits." T. 325.

Chesser again saw claimant on January 29, 2010, at which time claimant's father stated that claimant was "doing well in school, [ ] sleeping well, and not having any kind of side-effects." T. 316. Claimant again was assigned a GAF of 60. T. 316. His characteristics were noted to be "within normal limits," and his general attitude and behavior were described as "friendly/cooperative." T. 317. On March 22, 2010, Chesser noted that claimant's father continued to claim that he was doing very well. According to his father, the plaintiff was sleeping well and did not have "any kind of side-effects from his medications." T. 314. Chesser indicated, however, that claimant was out of his medications and "really need[ed] to get back on them." T. 314. His observations of plaintiff otherwise were similar to prior visits.

Close to three months later, on June 10, 2010, Chesser completed a Social Security Listing 112.11form, indicating that plaintiff had a "marked impairment" in the areas of attention, impulsiveness, hyperactivity, and "age appropriate social functioning (i.e. responding to supervision, playing well with others, handling disputes, etc.)." T. 349-50. He found plaintiff to have no "marked impairment" in "cognitive/communicative function (i.e. speech, understanding, etc.)" or "age appropriate personal functioning (i.e. hygiene, memory, getting dressed, etc.)." T. 350. He reiterated plaintiff's diagnoses of ADHD and disruptive behavior disorder, but indicated that plaintiff had no condition that affected his cognition, although he had a marked impairment in social skills. T. 351-52. Chesser also specified "marked" impairment in plaintiff's concentration, persistence, and pace. T. 353.

When Chesser saw plaintiff on August 15, 2010, he indicated that plaintiff's mother stated that the medication was going "pretty well for [plaintiff]." T. 358. Plaintiff had been prescribed Ritalin. T. 358. The following month, on September 15, 2010, Chesser stressed that plaintiff was "doing very well" on his medications and, in fact, "ha[d] done better than [his parents] expected." T. 355. He affirmed that plaintiff had ADHD and assessed a lower GAF of 55. He noted that plaintiff had been in conflict with family members, "sporadic" contact with his father, and occassionally had problems with his peers, attentiveness, and grades.[13] T. 355. In terms of functional progress, Chesser found plaintiff oriented, with appropriate affect and mood, normal thought content, appropriate goal-oriented thought processes, fair insight and judgment, and age appropriate intellectual functioning. T. 357.

Psychiatrist Brian Joseph saw claimant on November 2, 2009, and noted that claimant "claim[ed] to be doing well in school and sleeping well" and "denied side effect problems." T. 318. Dr. Joseph assigned claimant a GAF of 60 and observed that all of his characteristics were "within normal limits." T. 318-19. Dr. Joseph also evaluated claimant on June 17, 2010, on which date claimant's mother stated that claimant "ha[d] been doing fairly well since last seen" and passed the fifth grade. T. 359. Dr. Joseph indicated that claimant was "within normal limits" in all elements. T. 360.

The Social Security Disability Determination Office referred plaintiff for a consultive psychological examination, which was administered on October 7, 2010, by Cara Wheeler, Psy.D, and her supervisor, licensed psychologist Julian Salina,

---

[13] Specifically, Chesser opined that plaintiff's grades did not reflect his true ability.

Ph.D. T. 366. The evaluation consisted of review of a referral completed on September 15, 2010, by Medical Disability Advisor S. Kremser, Dr. Rahim's progress notes from September 9, 2008, through August 31, 2009, and a teacher questionnaire completed on May 8, 2002, by plaintiff's third grade teacher, Ms. May. T. 366. Drs. Wheeler and Salinas also interviewed the plaintiff. T. 366. They observed that plaintiff "demonstrated poor social skills" but had no notable physical problems and "spoke logically and coherently" with a "slow to normal rate and adequate volume of speech." T. 368. According to Dr. Wheeler and Ms. Salinas, the content of plaintiff's speech "was consistent with his reported level of education and borderline to extremely low intellectual functioning." T. 368. He responded to questions with "relevant, but poorly elaborated answers . . . for his age group" and had difficulty with concentration and recounting events and their chronology. T. 368. He also had trouble counting by threes to thirty, but recalled two of three objects on a memory exercise and appeared "adequately nourished." T. 368. Dr. Wheeler diagnosed plaintiff with "pervasive developmental disorder NOS," ADHD combined type, and borderline intellectual functioning (provisional). T. 368. In her summary of the evaluation, Dr. Wheeler noted that plaintiff's speech "ha[d] improved greatly through many years of speech therapy" and that plaintiff was capable of functioning in reciprocal relationships and would seek out enjoyment with other children. She further observed that plaintiff's ADHD medication appeared to be helpful, but that plaintiff needed to undergo "a full learning disorder testing battery (WISC-IV and WJ-III) to further assess his ability . . . ." T. 369. Dr. Wheeler opined that plaintiff likely would need "ongoing help in school . . . ." T. 369. Dr. Wheeler completed a childhood functional assessment form indicating that plaintiff had "extreme"

limitations in attending and completing tasks and interacting and relating with others, "marked" limitations in acquiring and using information, and "less than marked" limitations in the areas of moving about and manipulating objects, self-care, and health and physical well-being. T. 370. In the accompanying comments section, Dr. Wheeler wrote that plaintiff had poor social skills and difficulty with impulsivity, hyperactivity, and inattention. T. 370.

On November 16, 2010, after plaintiff appealed a denial of disability benefits, he visited Dr. Owen Oksanen, who reviewed "[a]ll of the pertinent medical records that were sent with the claimant . . . ." T. 372. Dr. Oksanen observed that plaintiff "did not appear in any way as impaired as his description on paper . . . . I could understand his speech. He was pleasant. He fidgeted a little bit but that was about all." T. 372. Dr. Oksanen expressed concern about "parental motivation," noting that plaintiff's mother insisted that her son was disabled and "needed help" herself. T. 373. According to Dr. Oksanen, when plaintiff asked his father about the meaning of "disability," his father essentially replied that "[disability] means your parents get a check every month until you're 18 and you'll never have to work again." T. 373. Dr. Oksanen also was concerned about plaintiff's parents' willingness to work with the plaintiff after he observed them refuse to help the plaintiff remove his shoes and criticize plaintiff's efforts in that regard. T. 373. Moreover, plaintiff's mother reacted angrily to Dr. Oksanen when he inquired as to the benefit plaintiff would receive from an additional disability evaluation. T. 373. Although Dr. Oksanen concluded that plaintiff had better functional capacity than the records indicated, he noted a "degree of cognitive impairment which would affect acquiring and using information" and opined that plaintiff's ADHD would effect "completion of tasks as

well as learning." T. 375. He further posited that the ADHD would affect plaintiff's interaction with and relation to others, development of friendships, and plaintiff's ability to be "comfortably" intertwined in a social network. T. 375. He recommended plaintiff's "current interventions to continue." T. 375. Finally, on a childhood functional assessment form, Dr. Oksanen indicated that plaintiff had "less than marked" limitations in every domain and function, except for moving about and manipulating objects [as to] which plaintiff had "no[ ]" limitation. T. 377.

<u>ANALYSIS</u>

Plaintiff raises three issues on appeal: 1) the ALJ erroneously adopted Dr. Oksanen's opinion, 2) the ALJ erroneously found that plaintiff's impairments did not meet Listing 112.11, and 3) the ALJ failed to properly assess whether plaintiff's mental impairments functionally equaled a listed impairment. (Doc. 13, pp. 12, 15).

*Dr. Oksanen's opinion versus other medical opinions*

Plaintiff's first claim–that the ALJ erred in adopting Dr. Oksanen's opinion–actually assigns fault to the ALJ's consideration of several medical opinions other than those advanced by Dr. Oksanen. Specifically, plaintiff argues that the ALJ should have afforded greater weight to the opinions of ARNP Chesser and Dr. Wheeler and lesser weight to Dr. Oksanen's opinion, and that the ALJ failed to consider certain portions of Mr. Schnepel's psychological report that would have supported a finding that plaintiff met or equaled the requirements of Listing 112.11. (Doc. 13, pp. 12-14). The undersigned will discuss the various opinions and the ALJ's consideration of them in turn.

The ALJ gave "little weight" to the opinion of ARNP Chesser. T. 31. The ALJ determined that Chesser's conclusions of "marked impairment" on the Social Security

Listing 112.11 form, T. 349-50, "are not based on clinical or objective evidence but largely on subjective complaints, as the records from the Life Management Center do not support such statements." T. 31. The ALJ noted that Chesser indicated that plaintiff had "marked impairments" in the areas of attention, impulsiveness, hyperactivity, and age appropriate social functioning, as well as "marked impairments" in the areas of social skills and "concentration, persistence, and pace," T. 352, but repeatedly indicated that plaintiff was improving and doing well on his medication.[14] T. 314, 316, 318, 324, 326, 328, 358. Moreover, on several different occasions, Chesser assessed plaintiff to be functioning, in a variety of respects, "within normal limits." T. 315, 317, 319, 325, 327, 329, 332. He also indicated–again, on a number of occasions–that plaintiff's "general attitude and behavior" were "friendly/cooperative," T. 315, 317, 325, 327, 329, 332, and that his motor behavior was "hyperactive," but still "within normal limits." T. 325, 332. Although Chesser indicated on the Social Security Listing form that plaintiff had "marked impairments" in several areas, during plaintiff's previous examination, he found plaintiff to be "doing very well," "friendly/cooperative," and functioning, in several respects, "within normal limits." T. 315. Two months after he completed the Listing 112.11 form, Chesser noted that plaintiff's mother considered him to be doing well on his medication and that plaintiff was progressing to the sixth grade. T. 358. Following his September 15, 2010, examination of plaintiff, Chesser again indicated that plaintiff was doing "very well" on his medications and had done better than his

---

[14] Notably, on June 17, 2010, just seven days after Chesser completed the Social Security Listing form, Dr. Joseph, who also was with the Life Management Center, found plaintiff to be "within normal limits" in all respects, T. 360.

parents expected. T. 355. He observed plaintiff to have normal thought content, age appropriate intellectual functioning, appropriate thought processes, appropriate mood and affect, and fair insight and judgment. T. 357. Chesser's conclusions concerning plaintiff's marked limitations, T. 349-53, are not consistent with his own findings and the other evidence of record. The ALJ, therefore, properly discounted ARNP Chesser's findings.

The ALJ also afforded "little weight" to Dr. Wheeler's psychological evaluation of claimant, T. 366-69, finding that Dr. Wheeler "relied far too heavily on the claimant's subjective complaints and . . . gave no supportive evidence for the conclusions reached." T. 31. In evaluating claimant, Dr. Wheeler reviewed a referral completed on September 15, 2010, by Medical Disability Adjudicator S. Kremser, Dr. Rahim's progress notes from September 9, 2008, through September 31, 2009, and a teacher questionnaire completed by claimant's third grade teacher, Sandra May.[15] T. 366. Dr. Wheeler also conducted a clinical interview with the claimant on October 7, 2010. T. 366. In her evaluation, Dr. Wheeler noted Dr. Rahim's diagnosis of ADHD and prescription for Concerta. T. 367. Dr. Wheeler also observed that, in the teacher questionnaire, Ms. May indicated that claimant had problems "completing work accurately without careless mistakes," as well as interacting and relating with others; that it was necessary to implement behavior modification strategies; and that, with medication, claimant was "calmer, more focused on tasks and completing assignments, able to control impulse to talk out and able to handle frustrating

---

[15] Disability Adjudicator Kramer's actual referral is not mentioned by Dr. Wheeler in her evaluation, nor can the undersigned find the referral in the record.

situations."[16]  T. 367.  Under the "acquiring and using information" portion of the questionnaire, Ms. May noted several "serious problem[s]," but indicated that plaintiff "use[d] his time wisely."  According to May, if plaintiff completed a task, he would proceed on to another one and had no "very serious problem[s]" other than completing work accurately and without careless mistakes.  T. 172-73.  Similarly, with regard to plaintiff's interaction with and relation to others, Ms. May noted no "very serious" problems and only one "serious" problem–"using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation."  T. 174. Finally, May had no problems understanding plaintiff's speech.  T. 175.

Based on her interview of the claimant, Dr. Wheeler found that he was able to follow a simple sequence of directions and was cooperative.  T. 368.  He was able to remain seated for a prolonged period of time "with no problem[,]" exhibited "adequate" expressive and receptive language skills, and had a friendly interpersonal demeanor but "poor social skills."  T. 368.  Dr. Wheeler observed that plaintiff spoke "logically and coherently adopting a slow to normal rate and adequate volume of speech," although the content of his speech was "consistent with . . . borderline to extremely low intellectual functioning."  T. 368.  Plaintiff responded to questions with relevant, but poorly elaborated, answers, had difficulty recounting events and their "chronology," and reported "some difficulties with concentration."  T. 368. Plaintiff spelled the word "snow" forward and backward, but could not spell "world." He recalled two of three objects after a brief delay with a distractive task and could not count by threes to thirty.  T. 368.  Dr. Wheeler determined that plaintiff had

---

[16] May's teacher questionnaire was completed on May 8, 2008, T. 178, prior to plaintiff being prescribed Concerta on June 18, 2008.  T. 277.

"extreme" limitations in the areas of "attending & completing tasks" and "interacting & relating with others," as well as "marked" limitations in the area of "acquiring & using information." T. 370. In the comments section of the childhood functional assessment, Dr. Wheeler indicated that plaintiff "demonstrates poor social skills and has difficulty [with] impulsivity, hyperactivity, and inattention."

Dr. Wheeler's conclusions are inconsistent with the objective evidence and a number of her own observations. For instance, plaintiff's pediatrician, Dr. Rahim, did not address plaintiff's limitations, except to the extent she prescribed plaintiff various medications such as Concerta and Ritalin. As for Ms. May's teacher questionnaire, Dr. Wheeler wrote in her report that May indicated that, after medication, plaintiff was "calmer, more focused on tasks and completing assignments, able to control impulse to talk out and able to handle frustrating situations." T. 367. Dr. Wheeler indicated that plaintiff had "extreme" limitations in the areas of attending and completing tasks, yet May indicated only one area, out of thirteen categories under the section titled "attending and completing tasks," in which he had a "serious problem"–completing work accurately without careless mistakes–and one area in which he had an "obvious problem"–"carrying out multi step instructions." T. 173. Moreover, in her observations, Dr. Wheeler wrote that plaintiff could follow a simple sequence of directions, was cooperative throughout the interview, was able to remain seated for a prolonged period of time "with no problem[,]" and spoke "logically and coherently adopting a slow to normal rate and adequate volume of speech." T. 368. She also noted that plaintiff provided relevant, but poorly elaborated, answers to questions and recalled two of three objects after a brief delay with a distractive task. T. 368. Neither Dr. Wheeler's own observations nor May's teacher questionnaire, on

which Dr. Wheeler relied in support of her finding of "extreme" limitation in the area of "attending and completing tasks," support Dr. Wheeler's conclusion. Further, although May considered plaintiff to have serious problems in five of ten categories under the topic of "acquiring and using information," she determined that plaintiff had only a "marked" limitation instead of an "extreme" limitation. Similarly, in the thirteen categories under the section titled "interacting and relating with others," May indicated that plaintiff had a serious problem in only one area–"using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation." T. 174. May noted, however, that plaintiff was on a behavior plan, had been in time out, occasionally got removed from the room, and, prior to January 2008, had suspensions and expulsions. Dr. Wheeler observed that, during her interview with the plaintiff, he was cooperative and " reciprocat[ed]" her verbal greeting "but failed to make eye contact until he sat down in the office." She further observed that plaintiff's interpersonal demeanor was friendly, although plaintiff "demonstrated poor social skills." T. 368. Dr. Wheeler concluded that plaintiff likely would "continue to function in reciprocal relationships and actively seek out enjoyment with other children," which is inconsistent with her finding that plaintiff had an "extreme" limitation in the area of interacting with and relating to others. T. 369. Dr. Wheeler's notation of poor social skills is unsupported by any observations or examples and, instead, seems to be based on May's opinion regarding plaintiff's expulsions, but without regard to May's specific findings concerning plaintiff's behavior. The ALJ thus appropriately concluded that Dr. Wheeler relied "far too heavily" on plaintiff's subjective complaints and discounted her opinion accordingly. T. 31.

Plaintiff also criticizes the ALJ's reliance on Schnepel's opinion. (Doc. 13, p. 13). The ALJ gave Schnepel's opinion "great weight," noting that he "found the claimant's attitude towards his teachers and school were positive and that his level of anxiety, frustration, and stress were normal for a child of his age." T. 31. Plaintiff claims that the ALJ failed to consider portions of Schnepel's opinion in which Schnepel indicated that plaintiff was functioning "below average cognitively and academically" and that Schnepel's opinion supports a finding that plaintiff met or equaled the requirement of listing 112.11. (Doc. 13, p. 13). Contrary to plaintiff's assertions, the ALJ acknowledged Schnepel's statement that plaintiff could not maintain his current level of functioning in "a setting with reduced emotional, behavioral, and motivational supports." T. 308. Moreover, Schnepel's conclusions are based on a series of tests he administered to plaintiff in an effort to gauge plaintiff's mental acuity. T. 306. Schnepel observed plaintiff during these tests and noted that plaintiff was cooperative, put forth a good effort, responded well to encouragement and redirection, was not overly active, had an attention span appropriate for his age, and had no emotional or behavioral difficulties.[17] T. 306. Schnepel posited that plaintiff's educational setting met his basic needs, noting that plaintiff's teachers reported "significant progress and improvements with the medication." T. 308.

"To meet or medically equal Listing 112.11 for ADHD, a claimant must present 'medically documented findings' of marked inattention, impulsiveness, and hyperactivity." *Turner ex rel. BDT v. Comm'r of Soc. Sec.*, 6:10-CV-1497-ORL-GJK,

---

[17] Schnepel also found that plaintiff had a "low tolerance for frustration and . . . did not like to be taken from his classroom." T. 306.

2012 WL 1004841, at *15 (M.D. Fla. Mar. 26, 2012) (*citing* 20 C.F.R. pt. 404 subpt. P, app. 1, § 112.11 ("§ 112.11")). In addition to the foregoing requirement, a claimant between the ages of three and eighteen must demonstrate a marked impairment in at least two of the following areas: age-appropriate cognitive/communicative function, age-appropriate social functioning, age-appropriate personal functioning, and maintaining concentration, persistence, or pace. § 112.02(B)(2). The undersigned cannot conclude that Schnepel's opinion supports a claim that plaintiff meets or equals Listing 112.11, particularly given Schnepel's observations that plaintiff was not "overly active," had an age-appropriate attention span, and did not have emotional or behavioral difficulties. Notably, Schnepel did not observe marked inattention, impulsiveness, or hyperactivity; in fact, he noted the contrary. In short, Schnepel's observations evidence age-appropriate social and personal functioning, as well as an ability to maintain concentration, persistence, and pace. The ALJ therefore did not err in his consideration of Mr. Schnepel's opinion.[18]

Finally, claimant takes issue with the ALJ determining plaintiff's functional limitations based on Dr. Oksanen's opinion. (Doc. 13, p. 14). The ALJ found Dr. Oksanen's opinion "persuasive" because it was "based on an in-person examination . . . complete with facts cited upon which the conclusions are based, and . . . largely consistent with the record as a whole." T. 31. Plaintiff makes several arguments in support of his position that the ALJ erred in relying so heavily on Dr. Oksanen's opinion. First, plaintiff points to the fact that Dr. Wheeler also examined the plaintiff in person, but that the ALJ rejected her opinion despite the fact that she is a

---

[18] The fact that plaintiff could not function at his current level with reduced support does not change the court's conclusion.

psychologist and Dr. Oksanen has no pediatric or psychiatric training. (Doc. 13, p. 14). As explained above, Dr. Wheeler's conclusions are not supported by her own observations or the objective evidence of record. *See supra* pp. 24-26. Moreover, the lack of formal training in certain practice areas is merely one factor the ALJ considers in assigning weight to an opinion. *See* 20 C.F.R. § 416.927(c)(1)-(6) (listing six considerations for the ALJ to weigh when deciding how much weight to assign to an opinion). Second, plaintiff seems to argue that Dr. Oksanen's failure to consider plaintiff's stature and below average weight rendered his opinion unreliable because such information is relevant under the Growth Impairment Listing section 100.03. (Doc. 13, p.14). This contention fails to account for the fact that Dr. Oksanen conducted an extensive physical examination of the plaintiff and noted that he had "good physical proportions and good apparent hygiene." T. 374. In other words, Dr. Oksanen concluded that plaintiff's physical examination was normal.[19] This court thus finds it less than conclusive that Dr. Oksanen placed little emphasis on the cited details of plaintiff's physical attributes.

Third, claimant contends that Dr. Oksanen was provided with no records. (Doc. 13, p. 12). This claim is contradicted by Dr. Oksanen's evaluation in which he states that he reviewed "[a]ll of the pertinent medical records that were sent with the claimant . . . ." T. 372. Fourth, claimant claims that Dr. Oksanen inappropriately focused on claimant's parents' conduct and claimant's psychological issues. (Doc. 13, p. 14). The conduct of claimant's parents, however, sheds light on claimant's sincerity, motivation, and credibility. Moreover, claimant's parents' behavior–and

---

[19] Based on plaintiff's vital signs, his weight of 90.4 pounds places him in the 55th percentile for children his age. T. 373.

their involvement in claimant's life and upbringing–impacts plaintiff's development or lack thereof and the discussion of claimant's credibility and motivation are relevant to his claim of disability.

Finally, plaintiff argues that Dr. Oksanen's opinion is "inconsistent with the evidence from the school, examining psychologists, and treating sources . . . ." (Doc. 13, p. 15). The court disagrees. In his findings, Dr. Oksanen admitted that while claimant was less impaired than what was implied in the record, "there still [was] a degree of cognitive impairment which would affect acquiring and using information." T. 375. Dr. Oksanen also found plaintiff to have "less than marked" limitations in all areas, except for moving about and manipulating objects, as to which he found plaintiff to have no limitations. T. 377. ARNP Chesser found plaintiff was doing well on medication, T. 314, 316, 318, 324, 326, 328, 358, and functioning, mostly "within normal limits." T. 315, 317, 319, 325, 327, 329, 332. On two occasions, Chesser found plaintiff's motor behavior to be "hyperactive," but still "within normal limits." T. 325, 332. Dr. Joseph noted that plaintiff "claim[ed] to be doing well in school and sleeping well" and "denie[d] side effect[s]" from his medication. T. 318. Dr. Joseph repeatedly assessed all of plaintiff's characteristics "within normal limits." T. 319, 360. Similarly, two state agency psychologists/physicians, Drs. Abrams and Zoss, found plaintiff's impairments or combination of impairments to be "severe" but not medically or functionally equal to the listings. T. 269, 271-72. Two other state agency psychologists/physicians, Drs. Hernandez and O'Neil, had findings similar to Dr. Oksanen. T. 280, 282-83. Schnepel, meanwhile, indicated that plaintiff was cooperative, put forth a good effort, responded well to encouragement and redirection, was not overly active, had an attention span appropriate for his age, and

did not have any emotional or behavioral difficulties. T. 306. Similar to Dr. Oksanen, Schnepel noted plaintiff was functioning "below average cognitively and academically." T. 308. He also stated that plaintiff's teachers reported that plaintiff had made significant progress since being prescribed medication. T. 308. Plaintiff's third grade teacher, Ms. May, echoed that sentiment, stating that, after taking the prescribed medication, plaintiff was "calmer, focuse[d] in on tasks and complete[d] assignments, [was] able to control impulse to talk out, able to handle frustrating situations." T. 177. Ms. May also found plaintiff to have very few "serious problem[s]," although she was concerned with plaintiff's ability to acquire and use information. T. 172. In all, the objective evidence of record is largely consistent with Dr. Oksanen's findings–that plaintiff is limited cognitively and academically, but that medication and academic intervention greatly improve his outlook and functional abilities. Finally, although Dr. Oksanen's findings differ from those of Drs. Wheeler and Salinas, the conclusions of Wheeler and Salinas are inconsistent with the objective evidence of record and their own findings and observations. *See supra* p. 24-26.

*Listing 112.11*

Claimant next argues that the ALJ erroneously found that he did not meet Listing 112.11. (Doc. 13, p. 15). To meet or equal Listing 112.11, claimant must show "medically documented findings" of marked inattention, impulsiveness, and hyperactivity, § 112.11, in addition to marked limitations in at least two of the following areas: age-appropriate cognitive/communicative function, age-appropriate social functioning, age-appropriate personal functioning, and maintaining concentration, persistence, or pace. § 112.02(B)(2).

Plaintiff maintains that he has a marked impairment in age-appropriate social functioning, "evidenced by his inability to perform at grade level despite extensive modifications in his schooling arrangements." Because plaintiff claims he is impaired in only one respect, he has failed to demonstrate that he meets or equals, as a matter of law, Listing 112.11. Nevertheless, the undersigned will address whether plaintiff demonstrates the marked limitations, with reference to section 112.02(B)(2), required to meet Listing 112.11.[20] As to plaintiff's cognitive and communicative function, ARNP Chesser repeatedly observed that plaintiff's cognitive functions, motor functions, and quality and content of "speech/thought" were "within normal limits." T. 315, 317, 325, 327, 329, 332, 357. He also noted that plaintiff's parents thought he was doing very well on his medications. Dr. Joseph, as well, assessed plaintiff's functions to be "within normal limits." T. 319, 360. Although Dr. Oksanen noted a "degree of cognitive impairment," he did not find such impairment sufficient to impose a marked limitation on plaintiff. T. 375-76. Similarly, Schnepel observed that plaintiff was functioning "below average cognitively and academically," but noted that plaintiff's teachers reported "significant progress and improvements on the medication." Social Worker Connor determined that plaintiff had "average" intellectual functioning and did not perceive any significant problems with plaintiff's speech. T. 344-45. The record thus contains substantial evidence to support a finding that plaintiff has no marked limitation in cognitive and communicative function.

---

[20] The undersigned will not address whether plaintiff has shown medically documented findings of marked inattention, impulsiveness, and hyperactivity because plaintiff has not shown marked impairments sufficient under section 112.02(B)(2) to meet Listing 112.11, rendering such a finding superfluous.

Plaintiff also has no marked limitation in his social and personal functioning. Indeed, Schnepel noted that plaintiff is comfortable in his present setting; that his levels of anxiety, frustration, and stress are age-appropriate; that plaintiff cooperated with testing and put forth a good effort; that plaintiff had no emotional or behavioral difficulties with the testing; that plaintiff had a positive attitude toward his teachers and school and could advocate for himself; and that, based on his current educational setting, plaintiff could participate in a manner "consistent with his abilities and level of maturity." T. 308. ARNP Chesser and Dr. Joseph found plaintiff's mood and affect, anxiety, appearance, perception, and sensorium to be "within normal limits." T. 315, 317, 319, 325, 327, 329, 332, 357, 360. Dr. Oksanen observed that plaintiff was pleasant. T. 372. Plaintiff's mother testified that plaintiff could tie his shoelaces, brush his teeth, bathe himself, "get" his own breakfast, catch the bus to and from school, and do household chores, such as taking out the trash and raking the yard. T. 52-53. Plaintiff also played football and went to church. T. 53. The foregoing evidence supports a finding that plaintiff functions appropriately, both socially and personally, for his age.

Finally, plaintiff does not demonstrate marked difficulties in maintaining concentration, persistence, or pace. Schnepel observed that plaintiff was not overly active and had an appropriate attention span for his age. T. 306. Speech Pathologist Kundo noted that claimant sat "appropriately" in his chair and was "attentive and polite" during the examination. T. 268. Dr. Oksanen observed that plaintiff "fidgeted a little bit, but that was about all." T. 372. Social worker Connor found plaintiff to be alert. T. 344. Because the record contains substantial evidence to support a finding that plaintiff does not have marked difficulties in maintaining concentration,

persistence, or pace, the ALJ appropriately determined that plaintiff did not meet listing 112.11.

*Assessment of claimant's mental impairments*

Claimant next argues that the ALJ failed to properly address whether his mental impairments functionally equal a listed impairment because the ALJ erred by placing undue reliance on Dr. Oksanen's opinion. (Doc. 13, p. 15). Contrary to claimant's argument, the ALJ afforded Dr. Oksanen's opinion appropriate weight. *See supra* p. 28-31. Dr. Oksanen's findings are largely similar to those of the four state agency consultants that reviewed plaintiff's case as well as those of Schnepel, Joseph, and the substantial weight of Chesser's records, all of which demonstrate that plaintiff has made great progress, both cognitively and communicatively, and that the prescription medication plaintiff has been administered is working very well.

Finally, plaintiff seems to argue that Dr. Oksanen was tasked with evaluating his physical condition under Listing 100.03. (Doc. 13, p. 16). Dr. Oksanen conducted a physical examination of plaintiff and recorded his findings. T. 374. Review of those findings evidences nothing significant out of the ordinary.[21] In his conclusion, Dr. Oksanen found no physical issues that needed to be added to the behavioral and psychological evaluations. T. 375. Accordingly, claimant's argument has no merit.

Based upon the foregoing analysis, the court finds the ALJ's decision to be in compliance with appropriate legal standards. *See Carnes*, 936 F.2d at 1218 ("[T]his

---

[21] Plaintiff was prescribed Concerta and Ritalin, both of which can decrease appetite. That may account for the plaintiff being prescribed an appetite stimulant. Dr. Oksanen noted the medications and their respective amounts in his evaluation.

Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  It is therefore respectfully RECOMMENDED:

The application for Supplemental Security Income benefits be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida, this 22nd day of August, 2013.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).